IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SEGA CORPORATION and SEGA OF AMERICA, INC., <br><br> Plaintiffs, <br><br> v. <br><br> THE PARTNERSHIPS and UNINCORPORATED ASSOCIATIONS IDENTIFIED ON SCHEDULE "A," <br><br> Defendants. | Case No. 23-cv-02619 <br><br> **Judge Sharon Johnson Coleman** <br><br> **Magistrate Judge Gabriel A. Fuentes** |

## DECLARATION OF PAUL VARLEY

I, Paul Varley, declare and state as follows:

1. This declaration is based upon my personal knowledge of the facts stated herein or on the business records that were made at the time or in the regular course of business. If called as a witness, I could and would testify to the statements made herein.

2. I am currently retained by Sega Corporation and Sega of America, Inc. ("Sega" or "Plaintiffs") as a consultant. I am knowledgeable about, or have access to, business records concerning all aspects of Sega's brand protection operation including, but not limited to, its copyrights, trademarks, sales, advertising, marketing, media coverage, and associated international operations. I make this declaration from matters within my own knowledge save where otherwise stated.

3. Plaintiff Sega Corporation is a Japanese corporation having its principal place of business at Sumitomo Fudosan Osaki Garden Tower, 1-1-1 Nishi-Shinagawa-ku, Tokyo 141-0033, Japan. Plaintiff Sega of America, Inc. is a California corporation having its principal place

1

of business at 6400 Oak Canyon, Suite 100, Irvine, California 92618. Plaintiffs are wholly owned subsidiaries of Sega Sammy Holdings, Inc., a publicly traded company on the Tokyo Stock Exchange. Sega Corporation and/or Sega of America, Inc. own the copyrights asserted in this action. Plaintiff Sega Corporation, Plaintiff Sega of America, Inc. and Sega Sammy Holdings, Inc. are referred to herein together or individually as "Sega."

4. Sega is a multinational video game, entertainment, and animation company, as well as a former manufacturer of home computers and video game consoles. Sega has developed and manufactured numerous video game consoles, including the famous video game consoles Sega Genesis and Sega Dreamcast, and also provides software as a third-party developer. Known as one of the most iconic developers in the video game industry, Sega has successfully developed and launched multiple video game franchises including *Sonic the Hedgehog*.

5. Sonic the Hedgehog, pictured below, is Sega's most famous video game character. Since the 1991 release of the first *Sonic the Hedgehog* game, the *Sonic the Hedgehog* video game series has gained worldwide popularity, with Sega generating at least 1.38 billion downloads of the series to date. The *Sonic the Hedgehog* video game series includes *Sonic the Hedgehog*, *Sonic the Hedgehog 2*, *Sonic Chaos*, *Sonic Mania*, and many others. In addition to the *Sonic the Hedgehog* video game series, Sega has developed a variety of Sonic the Hedgehog initiatives globally, including movies, animation, music, and

merchandising. Some of the characters and character names made famous by the Sonic the Hedgehog franchise include, but are not limited to:[1]

| | |
|---|---|
| **Sonic the Hedgehog** | |
| **Miles "Tails" Prower** | |
| **Knuckles the Echidna** | |

---

[1] The characters contained within the table are not an exhaustive list of the characters embodied in Sega's copyrighted works. This table is included only to provide examples of the characters found on the infringing products offered for sale or sold by Defendants. Regardless of any changes in their design, each of these characters, among others contained within Sega's copyrighted works, have always maintained their distinctive qualities and unique elements of expression.

3



| | |
|---|---|
| **Shadow the Hedgehog** | |
| **Dr. Robotnik/ Dr. Eggman** | |
| **Jet the Hawk** | |
| **Silver the Hedgehog** | |



| | |
|---|---|
| **Amy Rose** | |
| **Metal Sonic** | |
| **Chao** | |
| **Rogue the Bat** | |

| | |
|---|---|
| **Blaze the Cat** |  |
| **Big the Cat** | |
| **Tangle the Lemur** | |
| **Cream the Rabbit** | |

6. Since the release of the first *Sonic the Hedgehog* game in 1991, Sega has released twenty-five *Sonic the Hedgehog* video games and has developed numerous spin-off TV shows, comic books, and movies. In 2020, Sega partnered with Paramount Pictures Corporation to produce the feature film *Sonic The Hedgehog*. The movie grossed nearly $320 million worldwide and became the domestic top-grossing video game adaptation film at the time. A second film, *Sonic the Hedgehog 2*, was released in 2022.

7. Before Defendants' acts described herein, Sega launched the *Sonic the Hedgehog* video game franchise and its related line of products. Sega has also registered a multitude of works related to the Sonic the Hedgehog franchise and the characters embodied therein with the United States Copyright Office, including at least: (1) episodes of animated television shows based on the *Sonic the Hedgehog* video game series, including *Adventures of Sonic the Hedgehog* and *Sonic Boom*; (2) *Sonic the Hedgehog* video games; (3) *Sonic the Hedgehog* comic books; and (4) the two *Sonic the Hedgehog* films produced in 2020 and 2022, respectively (the "Sonic Copyrighted Works").

8. In 2019, Sega released the Sega Genesis Mini – a slick, miniaturized version of its famous Genesis video game console that was first released in the 1980s.[2] The Genesis Mini, designed to be ready to plug and play right out of the box, comes pre-loaded with 40 legendary Genesis games, including *Sonic the Hedgehog*, *Sonic the Hedgehog 2*, *Tetris*, and *Gunstar Heroes*. Due to the success of the Sega Genesis Mini, Sega released the Sega Genesis Mini 2 in October 2022.[3] The Sega Genesis Mini 2 is based on the Sega Genesis Model 2, a smaller version of the original Sega Genesis that was released in 1994.

---

[2] *See* https://genesismini.sega.com/.
[3] *See* https://sega.jp/genesismini2/.

9. Sega markets and sells a variety of products that feature the Sonic Copyrighted Works, including video games and video game consoles; accessories like key chains; backpacks; face masks; cell phone covers; apparel including t-shirts and sweatshirts; household items such as water bottles, mugs, blankets, and pillows; and other collectibles such as plush toys, comics, and toys (collectively, "Sonic Products").

10. Sonic Products have become enormously popular and even iconic, driven by Sega's quality standards and innovative designs. Among the purchasing public, Sonic Products are instantly recognizable as such. The Sonic the Hedgehog brand (hereinafter referred to as the "Sonic Brand") has become a global success and Sonic Products are among the most recognizable in the world. Sonic Products are distributed and sold to consumers through retailers throughout the United States, including through authorized retailers in Illinois such as Amazon, Old Navy, Target, Walmart, Best Buy, GameStop, and Kohls, and through the official shop.sega.com website. Sonic Products are sold only through authorized retail channels and are recognized by the public as being exclusively associated with Sega and the Sonic Brand.

11. The Sonic Copyrighted Works are registered with the United States Copyright Office. A true and correct copy of the record from the U.S. Copyright Office website for the Sonic Copyrighted Works is attached hereto as **Exhibit 1**. The Sonic Copyrighted Works embody the distinctive characters found in paragraph 5 above.

12. Since first publication, the Sonic Copyrighted Works have been used on Sonic Products and are featured on Sega's official websites.

13. The success of the Sonic Brand has resulted in significant copying of the Sonic Copyrighted Works. Because of this, Sega investigates suspicious websites and online

marketplace listings identified in proactive Internet sweeps. Recently, Sega has identified many fully interactive e-commerce stores offering Unauthorized Products on online marketplace platforms like Alibaba Group Holding Ltd. ("Alibaba"), AliExpress.com ("AliExpress"), Amazon.com, Inc. ("Amazon"), DHgate.com ("DHgate"), eBay, Inc. ("eBay"), Etsy, Inc. ("Etsy"), Fruugo.com Limited ("Fruugo"), and Context Logic, Inc. d/b/a/ Wish.com ("Wish"), including the e-commerce stores operating under the seller aliases identified in Schedule A to the operative complaint (the "Seller Aliases"), which were offering for sale and/or selling unauthorized and unlicensed products using infringing and and/or unauthorized copies of the Sonic Copyrighted Works (the "Unauthorized Products") to consumers in this Judicial District and throughout the United States.

14. I perform, supervise, and/or direct investigations related to Internet-based infringement of the Sonic Copyrighted Works. Our investigation shows that Defendants are using the Seller Aliases to sell Unauthorized Products from foreign countries to consumers in the U.S. and elsewhere. I, or someone working under my direction, analyzed each of the e-commerce stores operating under the Seller Aliases and determined that Unauthorized Products were being offered for sale to residents of the United States, including Illinois residents. This conclusion was reached through visual inspection of the products listed for sale on each e-commerce store, the price at which the Unauthorized Products were offered for sale, other features commonly associated with e-commerce stores selling infringing products, and because Defendants and their e-commerce stores do not conduct business with Sega and do not have the right or authority to use or copy the Sonic Copyrighted Works. Additionally, each e-commerce store offered shipping to the United States,

9

including Illinois. True and correct copies of screenshot printouts showing the active e-commerce stores operating under the Seller Aliases reviewed are attached as **Exhibit 2**.

15. Defendants have targeted sales to Illinois residents by setting up and operating e-commerce stores that target United States consumers using one or more Seller Aliases; offer shipping to the United States, including Illinois; accept payment in U.S. dollars; and, on information and belief, sell Unauthorized Products to residents of Illinois.

16. Defendants concurrently employ and benefit from substantially similar advertising and marketing strategies. For example, Defendants facilitate sales by designing the e-commerce stores operating under the Seller Aliases so they appear to unknowing consumers to be authorized online retailers, outlet stores, or wholesalers. E-commerce stores operating under the Seller Aliases appear sophisticated and accept payment in U.S. dollars via numerous methods, including credit cards, Alipay, Amazon Pay, and/or PayPal. E-commerce stores operating under the Seller Aliases often include content and images that make it very difficult for consumers to distinguish such stores from an authorized retailer. Sega has not licensed or authorized Defendants to copy or distribute the Sonic Copyrighted Works, and none of the Defendants are authorized retailers of Sonic Products.

17. E-commerce store operators like Defendants commonly engage in fraudulent conduct when registering the Seller Aliases by providing false, misleading, and/or incomplete information to e-commerce platforms to prevent discovery of their true identities and the scope of their e-commerce operation.

18. E-commerce store operators like Defendants regularly register or acquire new seller aliases for the purpose of offering for sale and selling Unauthorized Products. Such seller alias registration patterns are one of many common tactics used by e-commerce store operators

10

like Defendants to conceal their identities and the full scope and interworking of their operation, and to avoid being shut down.

19. Even though Defendants operate under multiple fictitious aliases, the e-commerce stores operating under the Seller Aliases often share identifiers, such as templates with common design elements that intentionally omit any contact information or other information for identifying Defendants or other Seller Aliases they operate or use. E-commerce stores operating under the Seller Aliases include other notable common features such as use of the same registration patterns, accepted payment methods, check-out methods, keywords, advertising tactics, similarities in price and quantities, the same incorrect grammar and misspellings, and/or the use of the same text and images. Additionally, Unauthorized Products for sale by the Seller Aliases bear similar irregularities and indicia of being unauthorized to one another, suggesting that the Unauthorized Products were manufactured by and come from a common source and that Defendants are interrelated.

20. E-commerce store operators like Defendants communicate with each other through QQ.com chat rooms and through websites such as sellerdefense.cn, ikjzd.com, kaidianyo.com, and kuajingvs.com. These websites provide tactics for operating multiple online marketplace accounts and evading detection by brand owners. The websites also tip off e-commerce store operators like Defendants of new intellectual property infringement lawsuits filed by brand owners, such as Sega, and recommend that e-commerce operators cease their infringing activity, liquidate their associated financial accounts, and change the payment processors that they currently use to accept payments in their online stores.

21. Infringers, such as Defendants, typically operate under multiple seller aliases and payment accounts so that they can continue operation despite plaintiffs' enforcement. E-commerce store operators like Defendants maintain off-shore bank accounts and regularly move funds from their financial accounts to off-shore accounts outside the jurisdiction of this Court to avoid payment of any monetary judgment awarded to plaintiffs.

22. Defendants are working in active concert to knowingly and willfully manufacture, import, distribute, offer for sale, and sell Unauthorized Products in the same transaction, occurrence, or series of transactions or occurrences. Defendants, without any authorization or license from Sega, have jointly and severally, knowingly, and willfully used and continue to use unauthorized copies of the Sonic Copyrighted Works in connection with the advertisement, distribution, offering for sale, and sale of Unauthorized Products into the United States and Illinois over the Internet.

23. Monetary damages alone cannot adequately compensate Sega for ongoing infringement because monetary damages fail to address the loss of control of and damage to Sega's reputation and goodwill. Furthermore, monetary damages are difficult, if not impossible, to completely ascertain due to the inability to fully quantify the monetary damage caused to Sega's reputation and goodwill by acts of infringement.

24. Sega's goodwill and reputation are irreparably damaged when the Sonic Copyrighted Works are reproduced, distributed, and displayed to the public without Sega's permission. Moreover, consumer brand confidence is damaged, which can result in a loss of future sales and market share. The extent of harm to Sega's reputation and goodwill and the possible diversion of customers due to loss in brand confidence are largely unquantifiable.

25. Sega is further irreparably harmed by the unauthorized use of the Sonic Copyrighted Works because infringers take away Sega's ability to control the nature and quality of the Unauthorized Products. Loss of quality control over goods offered for sale or sold that copy the Sonic Copyrighted Works and the subsequent loss of control over Sega's reputation are damages neither calculable nor precisely compensable.

26. Consumers who mistakenly believe that the Unauthorized Products originate from Sega will come to believe that Sega offers low-quality products. Inferior quality products will result in increased skepticism and hesitance in consumers presented with Sonic Products, resulting in a loss or undermining of Sega's reputation and goodwill. Indeed, there is damage to Sega's reputation and goodwill even if a consumer knows that the goods he or she is purchasing are unauthorized. Prospective consumers who see Unauthorized Products used by others may mistakenly believe such goods to be genuine and may consequently develop a poor impression of Sega and the Sonic Copyrighted Works. Such post-sale confusion results in damage to Sega's reputation and correlates to a loss of unquantifiable future sales.

27. Sega is further irreparably damaged due to a loss of exclusivity. Sonic Products are meant to be exclusive. Sega's extensive marketing efforts and distribution of Sonic Products are aimed at growing and sustaining sales of Sonic Products. The use of the Sonic Copyrighted Works on products signify to consumers that the products originate from Sega and are manufactured to Sega's high-quality standards. When infringers copy and use the Sonic Copyrighted Works to offer for sale or sell goods without Sega's authorization, the exclusivity of Sega's products, as well as Sega's reputation, are damaged and eroded, resulting in a loss of unquantifiable future sales.

28. Sega will suffer immediate and irreparable injury, loss, or damage if an *ex parte* Temporary Restraining Order is not issued in accordance with Federal Rule of Civil Procedure 65(b)(1).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April __26th__, 2023, at London, United Kingdom.

_____
Paul Varley